Richard D. McCune (State Bar No. 132124)
rdm@mccunewright.com
Steven A. Haskins (State Bar No. 238865)
sah@mccunewright.com
Valerie L. Savran (State Bar No. 334190)
vls@mccunewright.com
**MCCUNE LAW GROUP, APC**
3281 E. Guasti Road, Suite 100
Ontario, California 91761
Telephone:     (909) 557-1250
Facsimile:     (909) 557 1275

Emily J. Kirk (IL Bar No. 6275282)*
ejk@mccunewright.com
**MCCUNE LAW GROUP, APC**
231 N. Main Street, Suite 20
Edwardsville, IL 62025
Telephone: (618) 307-6116
Facsimile: (618) 307-6161

*Pro Hac Vice* application to be submitted

Attorneys for Plaintiff and the Putative Class

# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| MARLENE WAGMAN-GELLER, individually, and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>WELLS FARGO BANK, N.A., WELLS FARGO & CO, AMERICAN ARBITRATION ASSOCIATION, INC. and DOES 1 through 5, inclusive,,<br><br>Defendants. | Case No. 3:24-cv-06778-SK<br><br>**OPPOSITION TO DEFENDANTS WELLS FARGO BANK N.A. AND WELLS FARGO & CO'S MOTION TO COMPEL ARBITRATION OR, IN THE ALTERNATIVE, DISMISS THE FIRST AMENDED COMPLAINT**<br><br>**Hearing Date: April 14, 2025**<br>**Hearing Time: 9:30 a.m.**<br>**Courtroom: C**<br><br>Action Filed: September 26, 2024<br>Trial Date: None Set |

## TABLE OF CONTENTS

TABLE OF CONTENTS ............................................................................................ i

TABLE OF AUTHORITIES ................................................................................... ii

I.   INTRODUCTION ......................................................................................... 1

II.  STATEMENT OF FACTS ............................................................................ 1

    A.   The Contractual Relationship Between Wells Fargo and Consumers ......... 1

    B.   The Relationship Between Wells Fargo and AAA Is Based on AAA
        Protecting Wells Fargo's Interests ............................................................ 2

    C.   Plaintiff Was Charged Unfair and Deceptive Overdraft Fees and Properly
        Demanded Arbitration ............................................................................. 3

    D.   Other Related Litigation ......................................................................... 6

III. LEGAL STANDARD .................................................................................... 8

    A.   Motion to Compel Arbitration ................................................................. 8

    B.   Motion to Dismiss .................................................................................. 8

IV.  ARGUMENT .............................................................................................. 8

    A.   The Motion to Compel Arbitration Should Be Denied ............................. 9

    i.   *This Court Is the Proper Forum to Determine the Enforceability of The*
       *Arbitration Agreement* .......................................................................... 9

    ii.  *Defendants Engaged In Fraudulent Misrepresentations and Conduct*
       *Rendering The Arbitration Agreement Unenforceable* ............................ 10

        a.   Wells Fargo Engaged In Misrepresentation About The Arbitration
           Process ........................................................................................ 10

        b.   Wells Fargo's Knowledge About the Falsity Of Its Representations
           Can Be Inferred From The Circumstances ..................................... 12

        c.   The Allegations and Evidence Suggest Wells Fargo's Intent to
           Defraud or Induce Reliance On its Misrepresentations ................. 13

        d.   A Presumption of Reliance Applies Where The Misrepresentation
           Is Material To A Reasonable Consumer ....................................... 14

        e.   Plaintiff Suffered Damages As A Result Of The Harm ................. 15

    B.   The Motion to Dismiss Should Be Denied .............................................. 16

V.   CONCLUSION ........................................................................................... 17

CERTIFICATE OF SERVICE ............................................................................. 18

**OPPOSITION TO MOTION OF WELL FARGO TO COMPEL ARBITRATION OR DISMISS**
Case No. 3:24-cv-06778-SK

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Ahern v. Apple Inc.*,
  411 F.Supp.3d 541 (N.D. Cal. 2019)............................................................... 10, 11

*Alimena v. Vericrest Fin., Inc.*,
  964 F.Supp.2d 1200 (E.D. Cal. 2013) ................................................................... 16

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009) ................................................................................................. 8

*Boardman v. Pacific Seafood Grp.*,
  822 F.3d 1011 (9th Cir. 2016) ................................................................................. 8

*Buckeye Check Cashing, Inc. v. Cardegna*,
  546 U.S. 440 (2006) ..................................................................................... 8, 9, 10

*Chacanaca v. Quaker Oats Co.*,
  752 F.Supp.2d 1111 (N.D.Cal. 2010) ................................................................... 11

*Chapman v. Skype Inc.*,
  220 Cal.App.4th 217 (2013) ................................................................................. 15

*Copart, Inc. v. Sparta Consulting, Inc.*,
  277 F.Supp.3d 1127 (E.D.Cal. 2017) ............................................................. 12, 14

*Diamond Woodworks, Inc. v. Argonaut Ins. Co.*,
  109 Cal.App.4th 1020 (2003) ............................................................................... 14

*Engalla v. Permanente Med. Grp., Inc.*,
  15 Cal.4th 951 (1997) .................................................................................... 14, 15

*Hadley v. Kellogg Sales Co.*,
  273 F.Supp.3d 1052 (N.D.Cal. 2017)................................................................... 11

*Hansen v. LMB Mortg. Servs., Inc.*,
  1 F.4th 667 (9th Cir. 2021) ................................................................................... 16

*In re Tobacco II Cases*,
  46 Cal.4th 298 (2009) ........................................................................................... 15

*Lazar v. Superior Court*,
  12 Cal.4th 631 (1996) ........................................................................................... 10

*Leahy v. CMH Homes, Inc.*,
  2025 WL 318080 (N.D.Cal. Jan. 28, 2025) .......................................................... 16

**OPPOSITION TO MOTION OF WELL FARGO TO COMPEL ARBITRATION OR DISMISS**
Case No. 3:24-cv-06778-SK

1

*Mosley v. Wells Fargo*,
  2023 WL 3185790 (S.D.Cal. May 1, 2023) ........................................ 6, 7

2

3

*Nagrampa v. MailCoups, Inc.*,
  469 F.3d 1257 (9th Cir. 2006) ........................................ 8, 9, 10

4

*Prima Paint Corp. v. Flood & Conklin Mfg. Co.*,
  388 U.S. 395 (1967) ........................................ 8, 10

5

6

*Reilly v. Apple Inc.*,
  578 F.Supp.3d 1098 (N.D. Cal. 2022) ........................................ 8

7

8

*Somers v. Apple, Inc.*,
  729 F.3d 953 (9th Cir. 2013) ........................................ 8

9

*Vazquez v. Superior Court*,
  4 Cal.3d 800 (1971) ........................................ 14

10

11

*Veal v. LendingClub Corp.*,
  423 F.Supp.3d 785 (N.D.Cal. 2019) ........................................ 12

12

13  **<u>Statutes</u>**

14

9 U.S.C. § 2 ........................................ 8

15  12 U.S.C. §§ 5533, 5534(c) ........................................ 4, 5
   Cal. Bus. & Prof. Code § 17200 ........................................ 7, 9

16  Cal. Civ. Code § 1574 ........................................ 14
   Cal. Civ. Proc. Code 128.7 ........................................ 4

17

18  **<u>Regulations</u>**

19

12 C.F.R. § 1005.1 ........................................ 9

20  **<u>Other Authorities</u>**

21

Rest.2d Torts, § 538 ........................................ 15

22

23

24

25

26

27

28

**OPPOSITION TO MOTION OF WELL FARGO TO COMPEL ARBITRATION OR DISMISS**
Case No. 3:24-cv-06778-SK

## I.  <u>INTRODUCTION</u>

Rather than keep its promises, Wells Fargo & Company and Wells Fargo Bank N.A. (together, "Wells Fargo") have spent several years engaging in gamesmanship and employing obstructionist tactics – refusing to provide clients with their own data, inflating costs, and exploiting every possible opportunity to frustrate their customers' most rudimentary attempts to obtain justice. The core of Wells Fargo's litigation strategy was to induce customers, including Plaintiff Marlene Wagner-Geller, into waiving their substantive rights to a jury trial and protective class procedures, while preventing them from access to any substantive forum in which they might receive a fair hearing of their claims against Wells Fargo. She, and others who did the same, have not received the "streamlined, cost-effective" arbitration process Wells Fargo promised. Instead, Wells Fargo and the American Arbitration Association ("AAA") colluded to prevent Plaintiff, and hundreds of others, from obtaining a fair, neutral, and efficient arbitration proceeding. In short, Plaintiff never had a chance.

Unsurprisingly, Wells Fargo's solution for all this is more of the same: return Plaintiff to arbitration. That would be of obvious benefit to Wells Fargo, which has never had any intention of allowing Plaintiff, or similarly-situated consumers, a meaningful opportunity to pursue their claims. But Wells Fargo should not be rewarded for defrauding its customers by granting it the forum critical to its fraud. The Court should deny both motions and, most importantly, permit Plaintiff to bring her claims in the neutral forum Wells Fargo duped her out of.

## II.  <u>STATEMENT OF FACTS</u>

### A.  **The Contractual Relationship Between Wells Fargo and Consumers**

Wells Fargo offers checking accounts used by consumers to deposit and withdraw money. To establish and use an account, Wells Fargo requires customers to enter into its Deposit Account Agreement (the "Account Agreement"), which Plaintiff did. *See* First Amended Complaint ("FAC"), Dkt. No. 24, ¶¶ 41, 58, 161. The Account Agreement included an arbitration agreement ("Arbitration Agreement"), which required customers to pursue any dispute they might have with Wells Fargo through arbitration administered by AAA pursuant to its Consumer Arbitration Rules ("Consumer Rules"). *Id.*, ¶¶ 8-9, 16.

-1-

The Arbitration Agreement promised material benefits to Wells Fargo accountholders. They were promised access to a claim-resolution process able to resolve disputes "as quickly and easily as possible" and in a "more streamlined, cost-effective manner than a typical court case." *Id.,* ¶ 15. In return for accountholders having access to this "quick," "easy," "streamlined," cost-effective" process, Wells Fargo required them to waive their rights to pursue traditional litigation, as well as the right to participate in a class or collective action in any forum. *Id.*, ¶ 8.

### B.    The Relationship Between Wells Fargo and AAA Is Based on AAA Protecting Wells Fargo's Interests

Plaintiff alleges that Wells Fargo and AAA have a collusive relationship intended to prevent consumers from arbitrating their disputes. *Id.*, ¶¶ 52-57.

Like Wells Fargo, AAA makes various promises to consumers regarding its arbitration services. For example, it represents that "arbitration is usually faster and cheaper than going to court." *Id.*, ¶ 50. It also represents that "[p]roviders of goods and services should develop ADR programs which entail reasonable cost to Consumers based on the circumstances of the dispute, including, among other things, the size and nature of the claim…." *Id.* AAA further states that "[n]o party should ever be denied the right to a fundamentally-fair process due to an inability to obtain information material to a dispute." *Id.* To that end, AAA calls itself a "neutral, nonpartisan, not-for-profit public service organization," assuring consumers that it provides an unbiased forum for the consideration of arbitrated claims, including consumer claims. *Id.*, ¶ 51.

However, the connection between AAA and Wells Fargo is symbiotic and maintained both through their direct contractual relationship, and through the indirect means by which they collectively influence arbitration proceedings. For example, AAA's governing council and "Council of 80" are dominated by law firms representing banks, including Wells Fargo, and other large corporations. *Id.*, ¶¶ 53-54. These councils give law firms (and their clients) influence over both the creation and implementation of AAA's rules, often to the benefit of large corporations like Wells Fargo at the expense of consumers. *Id.*, ¶ 54. Moreover, these firms then draft arbitration clauses for their clients designating AAA as the entity that will oversee all disputes, financially benefiting AAA. *Id.*, ¶ 53. In turn, AAA is indebted to these law firms and

-2-

**OPPOSITION TO MOTION OF WELL FARGO TO COMPEL ARBITRATION OR DISMISS**
Case No. 3:24-cv-06778-SK

their clients, and it is in AAA's best interest to rule in their favor when disputes arise. This creates the exact opposite of the "neutral" and "fundamentally-fair process" both Wells Fargo and AAA promised Plaintiff and other consumers. *Id.*, ¶¶ 50-55.

Several other events and actions demonstrate AAA's lack of neutrality and independence. For example, the FAC alleges that the law firms that govern AAA have connections with the national interest group, the Chamber of Commerce, which opposes consumer class actions as a procedural mechanism for resolving consumer claims against large companies, including banks. *Id.*, ¶ 56. It comes as no surprise then that these law firms began using arbitration clauses that eliminated class action options for resolving small disputes affecting many people. *Id.* As a result, consumers began filing individual cases in arbitration. *Id.* Because these small disputes often involve thousands of consumers, they have been dubbed "mass arbitrations." *Id.*

Corporations, including banks, were not happy that consumers started filing thousands of claims in arbitration, so they turned to their law firms to help. One particular firm, Mayer Brown, which represents Wells Fargo, set out to revamp AAA's Rules to address these so-called "mass arbitrations." *Id.* Mayer Brown suggested that in these circumstances AAA should require claimants to provide case proof before being allowed to move forward with a claim. *Id.* It also suggested the use of a AAA-appointed "process arbitrator" to resolve certain preliminary matters *en masse* before cases could proceed to an individual arbitrator. *Id.* While Mayer Brown was in the process of designing this new system, AAA began appointing process arbitrators as Mayer Brown suggested, even though its rules did not provide for this practice, making the process of filing demands anything but streamlined and efficient. *Id.*

## C. Plaintiff Was Charged Unfair and Deceptive Overdraft Fees and Properly Demanded Arbitration

The gravamen of Plaintiff's substantive dispute is that Wells Fargo assesses overdraft fees to customers in multiple unfair and deceptive ways. *Id.*, ¶¶ 1-6; 58, 76-110. Because Wells Fargo assessed Plaintiff these allegedly improper overdraft fees, she followed the terms of the Account Agreement and served a Demand for Arbitration ("Demand") with AAA, seeking relief for Wells Fargo's wrongful act. *Id.*, ¶ 58; *see* Defendants' Motion to Compel Arbitration, Or, In

-3-

the Alternative, Dismiss The First Amended Complaint ("Defendants' Motion"), Dkt. No. 35 at 4. Based on Wells Fargo's promises, Plaintiff expected the process would be "the more streamlined, cost-effective" dispute resolution that Wells Fargo had promised. FAC, ¶¶ 1; 8-9; 15; 58. Unfortunately, that is not what she, or thousands of others with similar claims, received. *Id.*

Instead of appointing a merits arbitrator, AAA appointed a "Process Arbitrator," as Mayer Brown suggested, to oversee the process for claimants filing demands related to Wells Fargo's allegedly improper assessment of overdraft fees. *Id.*, ¶ 56. The Process Arbitrator issued her first order on October 27, 2022, requiring all Wells Fargo claimants, including Plaintiff, to satisfy a series of specific heightened pleading requirements before AAA would process their claims, despite AAA previously saying the demands met their pleading standards. *See* Defendants' Motion, Ex. 16. These requirements included 1) each claimant's Wells Fargo account number for the account at issue, (2) facts establishing that a claimant had been enrolled in Wells Fargo's overdraft program during the time period and (3) facts establishing that each claimant incurred overdraft fees in connection with transactions covered by Regulation E. *Id.* In addition to these factual allegations, the Process Arbitrator ordered claimants' attorneys, most of whom were represented by the McCune Law Group ("MLG") to "sign each Amended Claim as required by California Code of Civil Procedure 128.7." *Id.* These requirements were established for "all Claims submitted to [AAA]" after the Order was issued, and Wells Fargo's requirement to pay arbitration fees was stayed until all claimants satisfied these enhanced pleading requirements. *Id.*

Unfortunately, the information claimants needed to meet the Process Arbitrator's Order was in Wells Fargo's possession, not theirs. *See* FAC, ¶¶ 22; 56. Yet, when claimants requested access to their monthly statements and transactional account data which would provide the information to plead their claims, Wells Fargo refused to comply, despite legal requirements to do so. *Id.*, ¶ 22; *see also* 12 U.S.C. §§ 5533, 5534(c). Claimants requested the Process Arbitrator order Wells Fargo to provide them with this information, but she determined that information was "discovery," which only merits arbitrators could order, thus creating an endless loop of

-4-

claimants trying to access the information they needed to plead their claims from Wells Fargo, Wells Fargo refusing to provide it even though legally required to do so, and AAA refusing to help because only merits arbitrators could order Wells Fargo to produce the information. *Id*.; *see also* Defendants' Motion, Ex. 46. But, in reality, AAA was preventing claimants from getting to a merits arbitrator until they were able to allege the information that was in Wells Fargo's possession. *See* Defendants' Motion, Exs. 16, 44.

Thousands of claimants were caught in the middle of this scheme, and as a result, their claims were dismissed because they could not obtain the information the Process Arbitrator claimed they needed. *Id*., Ex. 50. Those who were fortunate enough to access monthly statements, like Plaintiff, were permitted to move forward with their Regulation E overdraft claims which could be substantiated through monthly statements. *Id*., Ex. 51. Accordingly, they were to be assigned to merits arbitrators. *Id*. Plaintiff was one of these individuals but her claim was not permitted to proceed until all claimants passed through the administration phase, which took over a year.

Plaintiff, like many other claimants, also made additional claims against Wells Fargo for its practice of charging Authorized Positive, Settled Negative ("APSN") and Representment overdraft fees. *See* FAC, ¶¶ 26; 75; 105-110. And while Representment overdraft fees are sometimes apparent from monthly statements, APSN fees are not. *See* Defendants' Motion, Exs. 44, 47. The only way to identify and substantiate APSN overdraft fees is through an analysis of account transactional data which customers do not have access to unless provided by the bank. *Id*.

Because the AAA's appointed Process Arbitrator refused to assist claimants, whether or not claimants could access this information about their own accounts was left up to each merits arbitrator. *See* Defendants' Motion, Ex. 46. This led to Wells Fargo spending the next several months trying to convince each individual merits arbitrator that claimants did not need access to the information, especially transactional data, while still demanding claimants meet the heightened pleading standard for every claim, and in the case of APSN claims, that could only be met through the use of transactional data. *See* FAC, ¶¶ 22-24. This led to briefing before each

-5-

1  individual arbitrator regarding the need to access data – briefing that resulted in thousands of

2  pages of information for each arbitrator to consider and resulting in different results for each

3  claimant. *Id.*, ¶¶ 22-24; 133.

4         Wells Fargo further exploited the preliminary hearing process to impose excessively

5  burdensome scheduling orders, turning these hearings into contentious fights and briefing battles.

6  *Id.*, ¶¶ 21, 24-25, 133. Often, multiple preliminary hearings were required just to untangle the

7  unnecessary complications and issues. *Id.* Wells Fargo further weaponized procedural demands

8  by insisting that claimants appear in person for all proceedings, including depositions – an

9  outdated and impractical requirement in the post-COVID era. *Id.* Worse still, Wells Fargo

10  insisted upon duplicative discovery in each case, refusing to consolidate even basic uniform

11  information, even though the practices at issue were uniform. *Id.*, ¶ 119. Wells Fargo even

12  insisted that its own corporate designee be deposed separately in each case, despite the

13  information being the same – an absurd and wholly unnecessary demand that would have

14  resulted in approximately 400 redundant depositions. *Id.*, ¶ 133.

15         AAA arbitrators, rather than curbing these abuses, largely enabled them, rarely ruling

16  against Wells Fargo's unreasonable tactics. *Id.*, ¶¶ 24; 133. The result was an exorbitantly time-

17  consuming and costly process that made it virtually impossible for claimants to make claims

18  worth a maximum of a few thousand dollars. *Id.* Faced with these facts, Plaintiff and other

19  claimants had no realistic choice but to dismiss their cases. *Id.* This outcome contrasts with

20  Wells Fargo's (and AAA's) assurances that arbitration would be a fair and cost-effective

21  alternative to litigation.  *Id.*, ¶¶ 1; 9-11; 15-18; 50.

22         **D.    Other Related Litigation**

23         In the immediate period following the Process Arbitrator's Order, several claimants—

24  also represented by MLG—filed suit against Wells Fargo in the Southern District of California.

25  *See Mosley v. Wells Fargo*, No. 22-CV-01976-DMS-AGS, 2023 WL 3185790 (S.D.Cal. May 1,

26  2023), *aff'd*, No. 23-55478, 2024 WL 977674 (9th Cir. Mar. 7, 2024) ("*Mosley* Litigation").

27  *Mosley* sought declaratory relief from that Arbitration Agreement or, alternatively, the Process

28

-6-

**OPPOSITION TO MOTION OF WELL FARGO TO COMPEL ARBITRATION OR DISMISS**
Case No. 3:24-cv-06778-SK

Arbitrator's Order. The *Mosley* Plaintiffs alleged that Order violated the Arbitration Agreement by denying the Plaintiffs the individual arbitration they were promised.

Judge Dana Sabraw of the Southern District of California held that the arbitrability of the *Mosley* Plaintiffs' declaratory relief claim was matter for the arbitrator, not the court. Judge Sabraw also held that the Process Arbitrator's Order was merely a procedural order that could not properly be reviewed by the court. *Mosley,* 2023 WL 3185790, at *4 (S.D.Cal. May 1, 2023). As a result, he concluded that Plaintiffs' claims must be compelled to arbitration, and the case was dismissed. The Ninth Circuit affirmed. *Mosley*, No. 23-55478, 2024 WL 977674, at *3.

In February 2024, multiple plaintiffs initiated a new lawsuit against Wells Fargo after their claims had been dismissed by the Process Arbitrator for failure to meet the arbitrarily imposed heightened pleading standard. The lawsuit, *Penuela, et al. v. Wells Fargo Bank, N.A., et al.,* 4:24-cv-766-KAW (N.D. Cal., Feb. 8, 2024), initially alleged claims against Wells Fargo for (1) violation of Regulation E and (2) violation of the California Unfair Competition law, Cal. Bus. & Prof. Code § 17200, *et seq.* *Penuela,* Dkt. No. 1. Plaintiffs then filed an FAC adding claims for (3) breach of contract, (4) breach of the implied covenant of good faith and fair dealing, (5) unjust enrichment, and (6) money had and received. *Penuela* at Dkt. No. 14. *Penuela* only brought claims against Wells Fargo and did not seek relief for the collusive conduct of AAA and Wells Fargo.

Wells Fargo simultaneously sought to transfer *Penuela* to the Southern District of California or, alternatively, to compel the *Penuela* Plaintiffs to arbitration. On November 6, 2024, Judge Westmore granted Wells Fargo's motion to transfer. *Penuela* at Dkt. No. 32. *Penuela* was subsequently transferred to the Southern District of California where it was assigned to Judge Sabraw, who had decided *Mosley*. *Penuela* at Dkt. No. 38. Shortly after *Penuela* was transferred, the Southern District reassigned both *Mosely* and *Penuela* to Judge Cheeks instead of Judge Sabraw. *Penuela,* Case No. 3:24-cv-2098-BJC-SBC (S.D. Cal. Jan. 24,

-7-

**OPPOSITION TO MOTION OF WELL FARGO TO COMPEL ARBITRATION OR DISMISS**
Case No. 3:24-cv-06778-SK

2025) at Dkt. No. 40. To date no ruling has been issued in *Penuela*, and its outcome remains unresolved.

## III.   LEGAL STANDARD

### A.   Motion to Compel Arbitration

The Federal Arbitration Act ("FAA") governs arbitration agreements. 9 U.S.C. § 2. The FAA affords parties the right to obtain a court order directing arbitration to proceed in the manner provided for in the agreement. *Id.* To decide a motion to compel arbitration, the court must determine (1) whether a valid agreement to arbitrate exists and, if it does, (2) whether the agreement encompasses the dispute at issue." *Boardman v. Pacific Seafood Grp.*, 822 F.3d 1011, 1017 (9th Cir. 2016). Additionally, it is the authority of the Court, not an arbitrator, to decide arbitrability where fraud in the inducement of the arbitration agreement itself is alleged. *Prima Paint Corp. v. Flood & Conklin Mfg. Co.*, 388 U.S. 395, 412 (1967). When determining the validity and enforceability of an arbitration agreement, courts may apply generally applicable contract defenses – such as fraud – without invalidating the FAA. *Nagrampa v. MailCoups, Inc.*, 469 F.3d 1257, 1268 (9th Cir. 2006); *Buckeye Check Cashing, Inc. v. Cardegna*, 546 U.S. 440, 446 (2006).

### B.   Motion to Dismiss

Rule 12(b)(6) tests the sufficiency of a complaint, requiring the Court to determine whether the plaintiff has pled factual allegations which "suggest that the claim has at least a plausible chance of success." *Reilly v. Apple Inc.*, 578 F.Supp.3d 1098, 1105 (N.D. Cal. 2022). In making this determination, courts must consider whether the complaint "contain[s] sufficient factual matter, accepted as true," and "state[s] a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Dismissal is only appropriate if the complaint fails to state a legally cognizable claim or lacks sufficient factual support to raise a right to relief above a speculative level. *Somers v. Apple, Inc.*, 729 F.3d 953, 959 (9th Cir. 2013).

## IV.   ARGUMENT

Plaintiff opposes Wells Fargo's motion to compel because the Arbitration Agreement is unenforceable because Plaintiff was fraudulently induced into the agreement by Defendants.

-8-

1  Wells Fargo's response that Plaintiff is bound to the agreement because she submitted her

2  demand to arbitration fails to grasp Plaintiff's challenge. Plaintiff had no reason to discover the

3  fraud until she entered into arbitration and discovered that, in fact, none of the representations

4  that Defendants had made about the process were true. It was only after Plaintiff was exposed to

5  a burdensome, costly, and unjust process that she had reason to bring this lawsuit.

6      The Court should also deny Defendants' motion to dismiss. Plaintiff has adequately

7  alleged claims for relief, including violations of Federal Reserve Regulation E, 12 C.F.R. §

8  1005.1, *et seq*. ("Reg E" or "Regulation E"), fraud in the inducement, unlawful business

9  practices under the California's Unfair Competition Law (the "UCL"), codified at Business and

10 Professions Code section 17200, *et seq*., and breach of contract. Defendants do not argue that

11 Plaintiff has insufficiently pled their alleged violations of Regulation E, the UCL, or their breach

12 of contract. They argue only that Plaintiff's fraudulent inducement claim should fail, but that

13 claim is well-pled for the same reasons that the motion to compel should be denied.  As a result,

14 the motion should be denied in its entirety.

15      **A.    The Motion to Compel Arbitration Should Be Denied**

16          **i.    *This Court Is the Proper Forum to Determine the Enforceability of The***

17              ***Arbitration Agreement***

18      The first reason the Court should deny the motion is that Defendants fraudulently induced

19 Plaintiff into the arbitration agreement, which renders it unenforceable. *Nagrampa*, 469 F.3d at

20 1268; *Buckeye*, 546 U.S. at 446. In particular, Defendants misled consumers into believing that

21 they would receive a fair, efficient, and cost-effective means of resolving disputes through AAA

22 arbitration. *See* FAC, ¶¶ 8-13, 127-134. In reality, Defendants had already colluded to create an

23 arbitration process designed to trap Plaintiff (and other claimants) in a loop of unnecessary delay,

24 excessive costs, and sharp bias. *Id*., ¶¶ 52-57.

25      Wells Fargo's first argument is that this Court has "no place for the exercise of

26 discretion" and must send Plaintiff back to the same doom loop, for an arbitrator to decide

27 whether the arbitration agreement is enforceable. But its argument disregards well-established

28 legal precedent affirming that "if the claim is fraud in the inducement of the arbitration clause

-9-

**OPPOSITION TO MOTION OF WELL FARGO TO COMPEL ARBITRATION OR DISMISS**
Case No. 3:24-cv-06778-SK

itself—an issue which goes to the 'making' of the agreement to arbitrate—the federal court may proceed to adjudicate it." *Prima Paint*, 388 U.S. at 404. In assessing the validity and enforceability of an arbitration agreement, courts are permitted to apply generally applicable contract defenses, including fraud, without contravening § 2 of the FAA. *Nagrampa*, 469 F.3d at 1268. Here, the Court is the proper forum for deciding whether the Arbitration Agreement was procured through fraud, and therefore, its enforceability.

### ii. *Defendants Engaged In Fraudulent Misrepresentations and Conduct Rendering The Arbitration Agreement Unenforceable*

Plaintiff alleges that Wells Fargo made material misrepresentations about the nature of arbitration, which induced Plaintiff into waiving her rights to sue Wells Fargo based on its wrongful conduct. *See* FAC, ¶¶ 1; 8-11; 15-18; 50. Proving a claim of fraudulent inducement requires a showing of a) misrepresentation, b) knowledge of falsity, c) intent to defraud or induce, d) justifiable reliance, and e) damage. *Lazar v. Superior Court,* 12 Cal.4th 631, 638 (1996). The FAC contains sufficient allegations as to each element of fraudulent inducement to render the Arbitration Agreement unenforceable under state law.

### a. <u>Wells Fargo Engaged In Misrepresentation About The Arbitration Process</u>

The FAC alleges several false statements in Wells Fargo's Arbitration Agreement – for example, it represented that arbitration is "more streamlined [and] cost-effective … than a typical court case" – that are actionable factual assertions, not mere puffery. Courts distinguish puffery from misrepresentation by assessing whether a statement is vague and subjective or specific and verifiable. *Ahern v. Apple Inc.*, 411 F.Supp.3d 541, 555 (N.D. Cal. 2019). Moreover, misleading representations about arbitration procedures can invalidate an agreement. *Buckeye*, 546 U.S. at 446; *Nagrampa*, 469 F.3d at 1268.

The Arbitration Agreement clearly states "that all customers will be entitled to a process that is 'more streamlined' and 'cost-effective' than a typical court case. FAC, ¶ 15. It also states that 'if you have a dispute with us, we hope to resolve it as *quickly* and as *easily* as possible.'" *Id*. Wells Fargo made these material misstatements in the context of inducing Plaintiff to agree to

OPPOSITION TO MOTION OF WELL FARGO TO COMPEL ARBITRATION OR DISMISS
Case No. 3:24-cv-06778-SK

1  the Arbitration Agreement and waive her rights to pursue litigation in court as well as class

2  relief. *Id.*, ¶¶ 1; 8-11; 15-20.

3           Wells Fargo also outlined the supposed benefits of arbitration to Plaintiff and other

4  customers. It stated that an "an impartial third party will hear the dispute . . . and provide a

5  decision." *Id.*, ¶ 9. It asserted that arbitration would be beneficial to the parties because "it

6  provides a legally binding decision in a more streamlined, cost-effective manner than a typical

7  court case." *Id.* In order to bestow upon accountholders this "quick" and "easy" dispute

8  resolution process, Wells Fargo stated that it would "pay any costs that are required to be paid by

9  us under the arbitration administrator's rules and procedures, and subject to applicable law." *Id.*,

10  Ex. C. at 35. But these statements were false. *Id.*, ¶¶ 19-20. In truth, Wells Fargo had colluded

11  with AAA to ensure that claims—and particularly claims arising from Wells Fargo's uniform

12  wrongful conduct or policies toward all consumers—would be mired in a process that was

13  neither "quick," "easy," or "streamlined." *Id.*, ¶¶ 52-57.

14           Wells Fargo's statements are not vague, extreme opinion easily dismissed by consumers,

15  but specific claims that arbitration is faster and cheaper than traditional litigation. *See Chacanaca*

16  *v. Quaker Oats Co.*, 752 F.Supp.2d 1111, 1125-26 (N.D.Cal. 2010) (holding that the terms

17  "wholesome" and "smart choices made easy" could not be determined puffery at the motion to

18  dismiss stage); *Hadley v. Kellogg Sales Co.*, 273 F.Supp.3d 1052, 1083 (N.D.Cal. 2017)

19  (determining that statements such as "healthy," "nutritious," and "lightly sweetened" could not

20  be concluded as a matter of law to be puffery at the motion to dismiss stage); *Ahern*, 411

21  F.Supp.3d at 557 (holding that Apple's statement that its products underwent "rigorous testing

22  methods that simulated customers' experiences" could be interpreted as a concrete claim that

23  testing occurred, making it a factual assertion "which could be established or disproved.").

24  These assertions are objectively measurable – they can be tested by comparing arbitration costs

25  and procedural timelines against traditional court proceedings. If, in reality, arbitration is slower,

26  more costly, or administratively inefficient, then the statement is false or misleading and serves

27  as grounds for fraudulent inducement. Plaintiff, and other claimants, relied on these claims when

28  agreeing to arbitration and their experiences clearly demonstrate that the arbitration process was

-11-

far more expensive and inefficient than a typical court case. *See* FAC, ¶¶ 1; 8-11; 15-20; 127-134. Accordingly, Wells Fargo's statements rise to the level of actionable factual assertions.

### b. Wells Fargo's Knowledge About the Falsity Of Its Representations Can Be Inferred From The Circumstances

Wells Fargo's statement that arbitration is "more streamlined [and] cost-effective ... than a typical court case" was a knowingly false or recklessly misleading assertion, designed to induce consumers into waiving their right to litigate in court. A statement is fraudulent if the speaker knew or should have known it was false, or if it was made with reckless disregard for the truth. *Veal v. LendingClub Corp.*, 423 F.Supp.3d 785, 801 (N.D.Cal. 2019); *Copart, Inc. v. Sparta Consulting, Inc.*, 277 F.Supp.3d 1127, 1148 (E.D.Cal. 2017). Knowledge is generally considered a question of fact.

Wells Fargo is a sophisticated financial institution with extensive experience in arbitration and was well aware of the inefficiencies, high costs, and procedural hurdles inherent in the process. However, Wells Fargo's misrepresentations went beyond mere industry knowledge – it actively participated in shaping the arbitration rules and procedures that it simultaneously promised were more efficient and cost-effective. *See* FAC, ¶¶ 21-23, 53-56.

As alleged, Wells Fargo has a collusive relationship with AAA, an organization that publicly markets arbitration as a faster and cheaper alternative to litigation while privately allowing financial institutions and their law firms to influence arbitration rules and procedures. *Id.*, ¶¶ 52-57. The AAA's governing bodies, including the Council of 80, are dominated by law firms that represent large corporations like Wells Fargo. *Id.*, ¶¶ 23-54. These firms not only influence the creation and implementation of AAA's rules but also draft arbitration clauses for their own clients, ensuring AAA is designated as the dispute resolution provider. *See id.*, ¶¶ 8, 53-54, 56. This symbiotic relationship creates a structural bias that contradicts Wells Fargo's and AAA's claims of neutrality and undermines the fairness of the arbitration process.

The procedural reality of arbitration reflects this bias. Rather than receiving the individualized dispute resolution process promised, Plaintiff was funneled into a mass arbitration that stalled for over a year while Wells Fargo litigated against consolidation – directly

**OPPOSITION TO MOTION OF WELL FARGO TO COMPEL ARBITRATION OR DISMISS**
Case No. 3:24-cv-06778-SK

1    contradicting its own justification for mandatory arbitration. When Plaintiff was finally allowed

2    to proceed, Wells Fargo and AAA imposed arbitrary and burdensome procedural obstacles. *Id.*,

3    ¶¶ 21-25, 133. These included forcing claimants to appear in-person for all proceedings,

4    including depositions, requiring duplicative discovery in each case despite their uniform nature,

5    and even requiring their own corporate designee to appear separately in each case (*i.e.*,

6    approximately 400 times), despite the information being the same. *Id.*, ¶¶ 119, 133.

7        Further, Wells Fargo and its law firms actively shaped AAA's approach to mass

8    arbitrations to its advantage. Mayer Brown, one of Wells Fargo's legal representatives, advised

9    AAA to introduce a new "process arbitrator" system – despite no existing rules permitting this

10   practice. *Id.*, ¶¶ 56, 133. AAA then appointed a process arbitrator who required claimants to

11   submit additional proof before proceeding, even when the relevant information was in Wells

12   Fargo's possession. *Id.*, ¶ 56. This maneuver resulted in the dismissal of thousands of claims due

13   to claimants' inability to access the necessary information, with AAA refusing to uphold the law

14   by requiring Wells Fargo to provide it. *Id.*, ¶¶ 22, 56. For those, like Plaintiff, who managed to

15   obtain the required materials for at least their Regulation E claim, the process remained drawn

16   out and costly – directly contradicting Wells Fargo's (and AAA's) promises of a fair,

17   streamlined, and cost-effective arbitration. *See id.*, ¶¶ 24-25, 56.

18       Given Wells Fargo's deep entanglement with AAA, its strategic manipulation of

19   arbitration rules, and its own conduct in arbitration – including excessive procedural delays,

20   meritless arbitrator challenges, and aggressive discovery tactics – it is clear that Wells Fargo

21   knew or should have known that its statements regarding arbitration were false. Its

22   misrepresentations were not merely aspirational or exaggerated; they were deliberate efforts to

23   mislead consumers into waiving their right to litigate in court and for class relief under the false

24   pretense of efficiency and affordability.

25       **c.    The Allegations and Evidence Suggest Wells Fargo's Intent to**

26       **Defraud or Induce Reliance On its Misrepresentations**

27       Moreover, Wells Fargo acted with the intent to deceive Plaintiff, and similarly-situated

28   claimants, into the Arbitration Agreement. Fraudulent intent is a question of fact that must be

-13-

determined by the trier of fact. To satisfy a demonstration of intent to deceive, a plaintiff need only show that the defendant intended to induce reliance on a false representation. *See Copart*, 277 F.Supp.3d at 1151 ("Intent is always a question of fact."); *Diamond Woodworks, Inc. v. Argonaut Ins. Co.*, 109 Cal.App.4th 1020, 1046 (2003) ("Fraudulent intent is an issue for the trier of fact to decide."); Cal. Civ. Code § 1574 ("Actual fraud is always a question of fact.").

      In this case, Wells Fargo made a false statement regarding the benefits of arbitration being "streamlined" and "cost-effective." FAC, ¶¶ 127-133. Wells Fargo's primary objective in making these statements was to induce Plaintiff's reliance upon the Arbitration Agreement in return for waiving her right to sue. *Id.*, ¶ 137. As a sophisticated financial institution with substantial experience in arbitration, Wells Fargo knew or should have known that the arbitration process it was promoting was neither streamlined nor cost-effective, particularly given its history of manipulating the arbitration process to inflate costs and delays. *Id.*, ¶¶ 133; *see id.*, ¶¶ 52-54, 56. The false representation was not an isolated statement; it was part of a deliberate effort to manipulate Plaintiff's decision making. Plaintiff was forced into a procedure designed by AAA and Wells Fargo for the very purpose of resisting claims brought by consumers, like Plaintiff. These procedures are particularly effective where Wells Fargo's conduct is uniform to all of its customers, as the resulting complaints create the very circumstances that make it impossible for claimants like Plaintiff to obtain relief.

      Given Wells Fargo's knowledge and conduct, it can reasonably be inferred that the false representation was made with the specific intent to induce Plaintiff's agreement to arbitration, knowing that the reality of arbitration would be far more burdensome than described. Therefore, while it is clear that it was Wells Fargo's intent to deceive Plaintiff with its false representation about the arbitration process, this issue of intent is one for the trier of fact.

### d. __A Presumption of Reliance Applies Where The Misrepresentation Is Material To A Reasonable Consumer__

      With regard to the reliance element of fraudulent inducement, "a presumption, or at least an inference, of reliance arises whenever there is a showing that a misrepresentation was material." *Engalla v. Permanente Med. Grp., Inc*., 15 Cal.4th 951, 976-77 (1997) (citing *Vazquez*

-14-

1   *v. Superior Court*, 4 Cal.3d 800, 814 (1971)). A misrepresentation is material where "a

2   reasonable man would attach importance to its existence or nonexistence in determining his

3   choice of action in the transaction in question." *Id.* (citing Rest.2d Torts, § 538, subd. (2)(a)).

4   And the materiality of a misrepresentation is generally a question of fact "unless the fact

5   misrepresented is so obviously unimportant that the jury could not reasonably find that a

6   reasonable man would have been influenced by it." *In re Tobacco II Cases*, 46 Cal.4th 298, 327

7   (2009).

8       Here, Wells Fargo made specific statements regarding the efficiencies and effectiveness

9   of arbitration proceedings over judicial proceedings. These statements include representations in

10  the Arbitration Agreement "that all customers will be entitled to a process that is 'more

11  streamlined' and 'cost-effective' than a typical court case." FAC, ¶ 15. It also represented that "if

12  you have a dispute with us, we hope to resolve it as *quickly* and *easily* as possible.'" *Id*. In the

13  context of a consumer waiving their rights to begin judicial proceedings, including actions for

14  class relief, a reasonable consumer depends on these representations, as these are surely not

15  rights consumers would bargain away for nothing. Moreover, whether Plaintiff read Wells

16  Fargo's statements in its Arbitration Agreement is not material to whether she can successfully

17  advance her fraud claim. Plaintiff had already been assured by Wells Fargo that she would

18  receive a swift and efficient arbitration , and therefore her reliance was justifiable[1] *See Chapman*

19  *v. Skype Inc*., 220 Cal.App.4th 217, 233-34 (2013) ("We conclude that Chapman's failure to read

20  the entire subscription agreement does not necessarily preclude her justifiable reliance on a

21  representation in the subscription agreement that the plan was "Unlimited" for purposes of

22  negligent and intentional misrepresentation.").

23          e.  **Plaintiff Suffered Damages As A Result Of The Harm**

24      Plaintiff has suffered harm due to entering into the Arbitration Agreement based on Wells

25  Fargo's false and material representations, regardless of the voluntary dismissal of the case. A

26  party that has been misled may suffer harm and recover for time and effort expended in reliance

27

28

---

[1] *See* FAC, Ex. C at 35.

**OPPOSITION TO MOTION OF WELL FARGO TO COMPEL ARBITRATION OR DISMISS**
Case No. 3:24-cv-06778-SK

1  on a defendant's misrepresentation. *Alimena v. Vericrest Fin., Inc.*, 964 F.Supp.2d 1200, 1213

2  (E.D. Cal. 2013), as corrected (Aug. 19, 2013). A party's fruitless efforts stemming from the

3  other's misrepresentation are sufficient to support a claim for damages. *Id*. at 1213.

4         Here, Plaintiff was misled into agreeing to the Arbitration Agreement based on the false

5  representation that the arbitration was more "streamlined" and "cost-effective" than traditional

6  judicial proceedings. *See* FAC, ¶¶ 1; 15. As a direct result of this misrepresentation, Plaintiff

7  incurred the cost of evaluating and entering the arbitration process where she was stuck for at

8  least eighteen months, which was far more costly and burdensome than represented by Wells

9  Fargo. This includes both the time and financial resources expended in initiating and engaging in

10 the arbitration process, all based on Wells Fargo's false representations. Plaintiff never

11 experienced an arbitration process that was the fair or cost-effective alternative Wells Fargo

12 claimed it would be. *Id*., ¶¶ 15-20; 52-57, 133. Instead of providing an efficient forum for dispute

13 resolution, Defendants orchestrated a kind of endurance test – one designed not to adjudicate

14 claims, but to exhaust and bankrupt consumers into abandoning their claims. The result was a

15 purposeful sham intended to insulate Wells Fargo from accountability and deprives consumers of

16 any meaningful path for recovery. Nor does Plaintiff's dismissal of the claim, negate any of the

17 does harm she suffered in the form of wasted time, effort, and expense, or eliminate the fact that

18 Plaintiff has not been afforded a neutral forum to resolve her dispute with Wells Fargo.

19        Plaintiff has sufficiently demonstrated the harm they suffered in the form of time,

20 resources, and effort expended based on the false and material representations made by Wells

21 Fargo.[2]

22        **B.    The Motion to Dismiss Should Be Denied**

23        Defendants' Motion to Dismiss is premised solely on Plaintiff's fraud in the inducement

24 claim. Should the Court identify deficiencies in the FAC, Plaintiff requests leave to amend.

25

26

27 [2] To the extent the Court requires additional fact-finding before ruling on the motion to compel,
   it should order an evidentiary hearing to resolve the parties' factual disputes. *See Hansen v. LMB*
28 *Mortg. Servs., Inc.,* 1 F.4th 667, 672 (9th Cir. 2021); *Leahy v. CMH Homes, Inc*., 2025 WL
   318080, at *3 (N.D.Cal. Jan. 28, 2025).

**OPPOSITION TO MOTION OF WELL FARGO TO COMPEL ARBITRATION OR DISMISS**
Case No. 3:24-cv-06778-SK

However, as set forth above, the FAC sufficiently alleges that the arbitration agreement was fraudulently induced, rendering it unenforceable. The same analysis is applicable here.

Notably, Defendants do not challenge Plaintiff's allegations under Regulation E, the UCL, or breach of contract. By failing to address these claims, they effectively concede their sufficiency. Accordingly, because the fraudulent inducement claim withstands scrutiny and no other basis for dismissal has been asserted, Defendants' motion must be denied in its entirety.

## V.    CONCLUSION

For the foregoing reasons, the Court should deny Defendants' Motion to Compel Arbitration and Defendants' Motion to Dismiss.

DATED: March 7, 2025                    Respectfully Submitted,

                                        **McCUNE LAW GROUP, APC**

                                        By:/s/ Richard D. McCune
                                        Richard D. McCune
                                        rdm@mccunewright.com
                                        Steven A. Haskins
                                        sah@mccunewright.com
                                        Valerie L. Savran
                                        vls@mccunewright.com
                                        McCUNE LAW GROUP
                                        McCune Wright Arevalo Vercoski
                                        Kusel Weck Brandt, APC
                                        3281 E. Guasti Road, Suite 100
                                        Ontario, California 91761
                                        Telephone: (909) 557-1250
                                        Facsimile:  (909) 557-1275

                                        Emily J. Kirk
                                        ejk@mccunewright.com
                                        McCUNE LAW GROUP
                                        McCune Wright Arevalo Vercoski
                                        Kusel Weck Brandt, APC
                                        231 N. Edwardsville, Illinois 62025
                                        Telephone: (618) 307-6116
                                        Facsimile:  (909) 557-1275

                                        *Attorneys for Plaintiff and the Putative Class*

-17-

**OPPOSITION TO MOTION OF WELL FARGO TO COMPEL ARBITRATION OR DISMISS**
Case No. 3:24-cv-06778-SK

1

<u>**CERTIFICATE OF SERVICE**</u>

2         I hereby certify that on March 7, 2025, I electronically filed the foregoing document

3    entitled **OPPOSITION TO DEFENDANTS WELLS FARGO BANK N.A. AND WELLS**

4    **FARGO & CO'S MOTION TO COMPEL ARBITRATION OR, IN THE**

5    **ALTERNATIVE, DISMISS THE FIRST AMENDED COMPLAINT** with the Clerk of this

6    Court for the United States District Court, Northern District of California using the CM/ECF

7    system and served a copy of the same upon al counsel of record via the Court's electronic filing

8    system.

9

10                                    By:<u>/s/Richard D. McCune</u>
                                          Richard D. McCune

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

-18-